# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-09-00366-CV

In re K.B.

FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 395TH JUDICIAL DISTRICT
NO. 08-325-F395, HONORABLE MICHAEL JERGINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The Texas Department of Family and Protective Services (the "Department") petitioned for the termination of the parental rights of appellant B.B., the mother of K.B.[1] After a jury trial, the jury found that the parent-child relationship between B.B. and K.B. should be terminated, and the trial court entered a final order terminating B.B.'s rights. On appeal, B.B. argues that the evidence is insufficient to show that a statutory ground for termination exists and that termination of B.B.'s parental rights is in the best interest of K.B., *see* Tex. Fam. Code Ann. § 161.001 (West Supp. 2009) (required findings for termination of parental rights), and that the trial court's conservatorship order should be reversed. We affirm the judgment of the trial court.

---

[1] In appeals from cases involving the termination of parental rights, the rules of appellate procedure require the use of an alias to refer to a minor, "and if necessary to protect the minor's identity, to the minor's parent or other family member." Tex. R. App. P. 9.8. In accordance with this rule, we will refer to B.B. and her children by their initials and to the children's fathers by their first names.

## BACKGROUND

K.B. is the fifth of B.B.'s six children.[2]  B.B.'s four oldest children, C.W.B., M.B., L.B., and C.A.B., were all under the managing conservatorship of the Department at the time K.B. was born.[3]  Audrey Williamson, a caseworker for the Department, testified that B.B. had voluntarily placed C.W.B. and M.B. outside of her home, while L.B. and C.A.B. had been removed by the Department due to allegations that Ben C., B.B.'s boyfriend and the father of K.B., had physically abused the children.[4]  Williamson stated that, due to B.B.'s history with the Department and concerns about the safety of the home environment, K.B. was removed from the hospital shortly after she was born.

After K.B.'s removal, the Department placed her with B.B.'s aunt so that B.B. could form a relationship with K.B. and eventually reunite with her.  Under the court-ordered terms of the placement, B.B. was not to have unsupervised access to K.B.  Further, the order stated that Ben was only allowed to interact with K.B. in a supervised setting at the offices of the Department.

When K.B. was approximately two months old, B.B. took her on an unsupervised visit to Ben at his workplace.  While B.B. testified that the visit was short and that no harm came to K.B., she admitted that the visit violated the court order that outlined the conditions under which she and Ben could interact with K.B.  Following the incident, the Department removed K.B. from her

---

[2]  The facts recited herein are taken from the testimony and exhibits admitted at trial.

[3]  B.B.'s youngest child, J.C., was one month old and was living with B.B. at the time of trial. Ben C. is J.C.'s father.

[4]  Ben voluntarily relinquished his parental rights regarding K.B. prior to trial.

placement with B.B.'s aunt and later initiated the termination proceedings that are the subject of this appeal.

At the trial on the Department's termination suit, B.B. testified about numerous past relationships that involved domestic violence. The first incident of domestic violence involved Phillip T., the father of B.B.'s two oldest children, C.W.B. and L.B. B.B. testified that between 1998 and 1999, Phillip would frequently push her during arguments, that he pushed her into a wall when she was pregnant with C.W.B., and that he kicked her when she was holding C.W.B., doing so with such force that she nearly lost her balance. Though they separated in 1999, B.B. and Phillip resumed their relationship in 2002 and again in 2005, when B.B. and three of her children moved in with Phillip. In February 2006, while the children were at a friend's house, Phillip severely assaulted B.B. B.B. required medical attention following the incident, and Phillip was incarcerated for the assault. When asked if "something like that could have happened when the kids were in the home," B.B. responded, "It could have; yes."

B.B. testified that she also had a violent encounter with a boyfriend named Matt in 2001. According to B.B., "It was just one night after he had gone out drinking. I guess I had decided I was going to leave, and he didn't want me to leave." B.B. testified that M.B. was present at the time of the incident.

B.B. next testified about her relationship with Ben, the father of K.B. B.B. and Ben started dating in early 2007. According to B.B., they frequently argued about Ben's unfaithfulness, untruthfulness, and the fact that he disciplined B.B.'s children in a manner that B.B. found inappropriate. B.B. testified that Ben dragged two-year-old C.A.B. up the stairs by one arm without allowing C.A.B. to get his footing. On another occasion, Ben "pushed" C.A.B. in the back of the

3

head, causing him to fall down and hit his head on the floor. Ben also hit C.A.B. in the mouth when he was two and L.B. in the mouth when she was four.

Ben was also violent towards B.B., pushing her twice when she was pregnant with K.B. During one incident in 2007, Ben pushed B.B., and she responded by attempting to punch him in the face. Some of B.B.'s children were in the home at the time, though B.B. testified that they did not witness the incident. B.B. was arrested following the altercation.

B.B. indicated that she dated Ben on and off for two years, reconciling with him even after telling CPS caseworkers that she understood that her relationship was potentially harmful to her children. In February 2009, three months before trial, B.B. and Ben discussed plans to get married. These plans were not realized, as Ben entered a program to treat substance abuse shortly thereafter. While B.B. stated that she was not in a relationship with Ben at the time of trial, she testified that she had maintained contact with him and had sent him several text messages shortly before the trial began.

B.B. also testified about her relationship with Fred, whom she dated during intervals when she was separated from Ben. B.B. testified that, while her relationship with Fred was not abusive, he was "controlling." Consequently, she and Fred argued frequently, which created a "chaotic" environment that B.B. testified was not good for her children.

B.B. testified that she did not realize until 2008 how detrimental it was for her children to be exposed to violent relationships, despite having been provided with counseling services and parenting classes by the Department since 2000. In 2008, she wrote a letter to the court stating that she intended to "break the cycle" of violent relationships in which she was engaged. The

4

letter also stated that she planned to find work to support her children and that she was living in stable housing. At trial, B.B. admitted that she continued to involve herself in violent relationships, particularly with Ben, after writing the letter. She also stated that she had not found employment and that she had lived in seven different places during the year preceding the 2009 trial. During her testimony, however, she reiterated her intent to stay out of violent relationships and to provide a stable home environment for K.B.

Thea Burns, a Department caseworker, testified that at the time of trial B.B. had received counseling and other services from the Department for over nine years, but that she continued to repeat previous mistakes, particularly with regard to entering into violent relationships. Burns also testified that B.B.'s home was not equipped for K.B. to live there. Although B.B. had acquired a crib, clothes, and diapers for her newborn, J.C., she had not made any similar preparations regarding K.B. According to Burns, K.B. was placed with her paternal grandparents at the time of trial and was doing "very well."

Michelle Zuniga, a family group decision-making coordinator with the Department, testified about B.B.'s parenting. According to Zuniga, who observed B.B. over the course of several years, B.B. often became "overwhelmed and frustrated" when dealing with her children. B.B. would frequently yell at her children, call them names, and use profanity when addressing them. She would occasionally throw things in the vicinity of the children after becoming frustrated or angry, and she once spanked one of her children with a belt.[5] While she was not generally abusive with her

---

[5] B.B. also testified that she had sometimes disciplined her children by hitting them with wooden spoons before being instructed by the Department that such behavior was inappropriate.

children, she was "rough" with them, and displayed little affection toward them. Zuniga testified that, while B.B.'s parenting skills improved after she received services in 2002, by 2006 many of those improvements had eroded. Zuniga also stated that she became concerned about B.B.'s lack of financial independence and her tendency to rely on the men she was dating for support, particularly as many of B.B.'s relationships involved domestic violence.

Several months before trial, Dr. Timothy Daheim performed a psychological evaluation of B.B. Daheim testified that, during the evaluation, B.B. told him about additional incidents of violence involving the children. According to Daheim, B.B. told him that she had struck M.B. after M.B. had spit at her. B.B. also told Daheim that Ben's behavior, including striking the children in public in a Wal-Mart store, concerned her. However, B.B. told Daheim that she loved Ben and thought he could change. Daheim stated that B.B. has been abused by each of the four men with whom she has had children and that B.B. had "personality traits associated with dependency," indicating that she needs to be in a relationship all of the time. Daheim also testified that B.B. has a history of depression and bipolar disorder. Based on his evaluation of B.B., Daheim gave B.B. a "diagnosis of Depressive Disorder, . . . a neglect of children diagnosis, and physical abuse of a child as a victim, self report." Daheim also stated that psychological tests indicated that B.B. had difficulty with anger, aggression, and impulsive behavior. Daheim stated that, based on his observations, B.B.'s prognosis for making and sustaining progress was "very poor."

In addition to her own testimony, B.B. offered the testimony of Kelly Horine, who has known B.B. since 1995. Horine testified that she had observed B.B. interact with her children

6

on numerous occasions, and stated that B.B. was a good mother who did not exhibit any anger issues.

At the conclusion of trial, the jury found that the parent-child relationship between B.B. and K.B. should be terminated. The trial court entered judgment terminating B.B.'s parental rights, and this appeal followed.

## STANDARD OF REVIEW

To terminate a parent's rights to her children, which are of constitutional dimension, *In re J.W.T.*, 872 S.W.2d 189, 194-95 (Tex. 1994), the factfinder must find clear and convincing evidence that (1) the parent has engaged in the conduct set out as statutory grounds for termination and (2) termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *see* Tex. Fam. Code Ann. § 161.001. "Clear and convincing evidence" is the level of proof required to produce a firm belief that the Department's allegations are true. *C.H.*, 89 S.W.3d at 23.

In cases involving termination of parental rights, we review the legal sufficiency of the evidence by viewing all of the evidence in the light most favorable to the factfinder's determination and asking whether a reasonable factfinder could have formed a firm conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal-sufficiency review, a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* An appellate court disregards all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

When reviewing the factual sufficiency of the evidence supporting a finding terminating parental rights, the inquiry is whether the evidence is such that a factfinder could

reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *Id.* We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so and we disregard evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* Evidence is factually insufficient only if a reasonable factfinder could not have resolved the disputed evidence in favor of its finding and if the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

## DISCUSSION

In three issues on appeal, B.B. challenges the legal sufficiency of the evidence supporting the statutory grounds for termination, the factual sufficiency of the evidence indicating that termination of B.B.'s parental rights is in K.B.'s best interest, and the propriety of the court's conservatorship order. We address each issue in turn.

### *Statutory Grounds*

In her first issue on appeal, B.B. argues that the evidence is legally insufficient to support a finding of any of the statutory grounds for termination raised by the Department by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(1) (requiring finding of one statutory ground to support termination order). At trial, the Department presented evidence regarding subsections (D), (E), and (O) of section 161.001(1) of the family code, which support a termination order based on clear and convincing evidence that a parent has:

8

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

. . . [or]

(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . .

*Id.*

We begin with subsection (E), as it is the only ground addressed by the Department in its brief. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (explaining that only one statutory ground is needed to support termination of parental rights). Under subsection (E), the "conduct" that endangers the physical or emotional well-being of the child must be more than a single act or omission by the parent; rather, "a voluntary, deliberate and conscious 'course of conduct' that endangered the child's physical and emotional well-being is required." *Williams v. Williams*, 150 S.W.3d 436, 450 (Tex. App.—Austin 2004, no pet.) (citing *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 534 (Tex. 1987)). "Endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533. The danger must constitute "more than the threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but it is not necessary that the endangering conduct be specifically directed at the child or even result in concrete physical or emotional injury. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (citing *Boyd*, 727 S.W.2d at 533).

9

As a general matter, conduct that subjects a child to a life of uncertainty and instability may endanger the child's physical and emotional well-being under subsection (E). *In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009). Texas courts have found relevant conduct to include exposure of children to domestic violence. *See In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (considering fact that mother "exposed her children to domestic violence," including incident where mother was "smacked" in front of child, as evidence of endangerment under subsection (E)); *In re J.C.*, 151 S.W.3d 284, 288 (Tex. App.—Texarkana 2004, no pet.) (holding that "violent acts and behavior directed at one child and at the child's mother in the presence of the other children" can establish course of conduct endangering child). Moreover, violent or negligent conduct directed against a child's siblings or parent may constitute endangerment "even where the behavior was not committed in the child's presence." *J.C.*, 151 S.W.3d at 289; s*ee also In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.) (holding that courts may look to conduct occurring prior to child's birth in determining whether termination is necessary).

In this case, B.B.'s own testimony established that she had exposed her children to domestic violence through her relationships. She testified that Phillip had pushed her when she was pregnant and had kicked her so forcefully when she was holding C.W.B. that she nearly lost her balance. She testified that she reconciled with Phillip despite these incidents, and that in 2006 he assaulted her so severely that she required medical care, after which Phillip was incarcerated. B.B. testified that she had an altercation with her boyfriend Matt while one of her children was present.

10

B.B. testified that Ben pushed her when her children were present and that she responded by attempting to punch him in the face, an incident for which she was charged with assault.

B.B. testified that she had been involved in violent relationships since 1998, and that she continued to associate with violent men despite recognizing that her relationships had a detrimental effect on her children. Daheim and B.B.'s caseworkers reiterated that B.B. had engaged in a pattern of entering into violent relationships for many years prior to trial.

B.B. also testified about acts of violence directed at her children. B.B. testified that Ben had dragged C.A.B. up the stairs by one arm and had hit L.B. and C.A.B. in the mouth. Daheim testified that B.B. had admitted that Ben had struck her children in a Wal-Mart store. There was also evidence that B.B. herself had been violent with her children. Daheim testified that B.B. had stated that she had struck M.B. after M.B. had spit at her. Further, Zuniga testified that B.B. had admitted to hitting L.B. with a belt when L.B. was four years old. There was also testimony that B.B. had hit her children with wooden spoons.

This testimony constitutes some evidence that B.B.'s course of conduct endangered the physical and emotional well-being of her children. *See Williams*, 150 S.W.3d at 450. B.B. nonetheless argues that the evidence is insufficient because B.B. never placed K.B. in danger, as K.B. was removed from B.B.'s custody at birth and was only returned to her with instructions that their interaction be supervised. As explained above, however, the endangering conduct need not be directed at the child who is the subject of removal proceedings, as conduct towards other children may suffice to support a finding of endangerment. *See J.C.*, 151 S.W.3d at 288. Accordingly, as a reasonable factfinder could have formed a firm belief that B.B. engaged in a course of conduct that

11

endangered the physical or emotional well-being of her other children, the evidence is legally sufficient to support termination of B.B.'s parental rights regarding K.B. under subsection (E). *See J.F.C.*, 96 S.W.3d at 266.

As only one predicate finding under section 161.001(1) is necessary to support a termination order, we need not address B.B.'s challenges to the evidence supporting termination under subsections (D) and (O). *A.V.*, 113 S.W.3d at 362. B.B.'s first issue on appeal is overruled.

### *Best Interest*

In her second issue on appeal, B.B. argues that the evidence is factually insufficient to support a finding that termination of her parental rights is in K.B.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(2) (requiring best interest finding to support termination order). The best interest of the child is assessed using a non-exhaustive list of factors. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors include (1) the child's wishes, (2) her emotional and physical needs now and in the future, (3) emotional or physical danger to the child now and in the future, (4) the parenting abilities of the parties seeking custody, (5) programs available to help those parties, (6) plans for the child by the parties seeking custody, (7) the stability of the proposed placement, (8) the parent's conduct indicating that the parent-child relationship is improper, and (9) any excuses for the parent's conduct. *Id.* at 372. The Department need not prove all nine *Holley* factors as a "condition precedent" to termination, and the absence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination is in a child's best interest, especially when there is undisputed evidence that the parental relationship endangered the child. *C.H.*, 89 S.W.3d at 27. While no one factor is controlling, analysis of a single factor may be

12

adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.). Permanence is of paramount importance in considering a child's present and future emotional and physical needs. *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no pet.).

In this case, the evidence regarding B.B.'s exposure of her children to domestic violence informs our analysis of the third *Holley* factor, which involves emotional or physical danger to the child now and in the future. *See Horvatich v. Texas Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601 (Tex. App.—Austin 2002, no pet.) (explaining that parent's statutorily offensive conduct is often intertwined with best interest determination); *see also C.H.*, 89 S.W.3d at 27 (explaining that undisputed evidence of danger to child is particularly relevant to best interest analysis). B.B.'s pattern of involvement in violent relationships provides cause for concern regarding K.B.'s physical and emotional well-being, and the testimony of those affiliated with the Department indicated that B.B. is unlikely to make or sustain significant improvement in this area.

In addition, the testimony at trial raised issues regarding B.B.'s ability to care for her children. According to Zuniga's testimony, B.B. becomes frustrated and overwhelmed when attempting to care for her children, rarely shows her children affection, and sometimes becomes agitated to the point of throwing things in the vicinity of her children. In addition, the testimony at trial indicated that B.B. had, on separate occasions, struck one of her children after the child had spit at her, spanked one of her children with a belt, and hit her children with wooden spoons. While Horine testified that B.B. did not have any anger issues that affected her parenting, the jury could have disregarded this testimony in light of the evidence of violence.

13

Further, while there are services available to B.B. to aid in her parenting, the testimony of Department caseworkers indicates that B.B. has not significantly improved despite being provided with services, including parenting classes and counseling, for approximately a decade. This testimony indicates that B.B. would not improve with access to additional services.

Finally, while B.B. indicated that she had found stable housing at the time of trial and was prepared to care for K.B., the fact that she had lived at seven different residences in the year prior to trial raises concerns regarding stability and permanence. *Dupree*, 907 S.W.2d at 87 ("The goal of establishing a stable, permanent home for a child is a compelling interest of the government."). Further, Burns testified that B.B. had not made any preparations for K.B. to live in her current residence.

B.B. nonetheless argues that the evidence is factually insufficient because her "participation in services, separation from [Ben], and her discussion of her understanding of her services do not indicate that her parental rights should have been terminated." As noted above, while B.B. has participated in services, this participation has not led to lasting improvement. Further, B.B.'s statement that she had separated from Ben and intended to keep bad influences out of her life is not conclusive. The testimony at trial indicated that her pattern of behavior was ongoing, as she had discussed marriage with Ben as recently as three months prior to trial and reunited with him numerous times in the past after telling her caseworkers that she had permanently ended her relationship with him. Further, even if the jury concluded that she had improved, the jury was free to determine that any recent improvements did not outweigh her past behavior. *See In re M.G.D.*, 108 S.W.3d 508, 514-15 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that evidence

14

of recent improvement and compliance with service plan is not determinative when evaluating child's best interest).

Based on this analysis, we conclude that the jury could reasonably have formed a firm belief or conviction that termination of B.B.'s parental rights was in K.B.'s best interest. Accordingly, the evidence is factually sufficient, and B.B.'s second issue on appeal is overruled.

### *Conservatorship Order*

In her third issue on appeal, B.B. argues that reversal of the order terminating her parental rights should also result in reversal of the trial court's conservatorship appointment of the Department as sole managing conservator of K.B., as the order was based solely on the termination of B.B.'s parental rights. As we affirm the trial court's judgment terminating B.B.'s parental rights, we have no grounds before us on which to reverse the conservatorship order. B.B.'s third issue is overruled.

## CONCLUSION

Because we find no reversible error, we affirm the judgment of the trial court.

_____

David Puryear, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed:   December 9, 2010

15